[File No. 7104]

INEZ McCULLAGH, Respondent, v. WILLIAM F. FORTUNE, SR., William F. Fortune, Jr., and John P. Fortune, Appellants.

(38 NW2d 771)

Opinion filed March 21, 1949.   Rehearing denied Aug. 15, 1949.

*Wattam, Vogel & Vogel,* for appellants.
*Nilles, Oehlert & Nilles,* for respondent.

CHRISTIANSON, J. Plaintiff brought this action to recover damages for personal injuries which it is alleged she sustained on March 11, 1947, by reason of the negligence of the defendants. In their answer the defendants admit that plaintiff has been injured but deny that such injuries were caused by the negligence of the defendants and allege that the plaintiff was guilty of contributory negligence and that such negligence was the proximate cause of her injuries.

The case was tried to a jury. At the close of plaintiff's case and again at the close of the entire case defendants moved for a directed verdict on the grounds that the evidence failed to establish negligence on the part of the defendants and that the evidence established that plaintiff's injuries were caused by her own negligence. Both motions were denied and the case submitted to the jury. The jury returned a verdict in favor of the plaintiff for $8,500. Judgment was entered pursuant to the verdict and the defendants have appealed. They assign error upon the denial of the motions for a directed verdict, and upon the action of the court in refusing to give certain instructions. They contend that the evidence is insufficient to sustain the verdict, that the verdict is against the law; that the evidence does not establish that the defendants were guilty of any negligence proximately causing the accident; that the evidence conclusively shows that plaintiff was guilty of negligence which proximately caused the accident, and that the plaintiff as a matter of law assumed the risk of the accident and is barred from any recovery.

The material facts as shown by the evidence are substantially as follows:

The defendants are the owners of an apartment building in the City of Fargo known as the Ansonia Building. The defend-

ants purchased this building and entered into possession thereof about November 1, 1946. The plaintiff was then a tenant of the former owners and occupied an apartment in the building and had been occupying the same for some two years. She continued to occupy such apartment as a tenant of the defendants after their purchase of the building. The apartment occupied by the plaintiff was the only apartment in the basement although another basement apartment was under construction at the time the accident occurred.

There was a passage-way or corridor running east and west the entire length of the basement,—a distance of some 75 feet. This passage-way was some five or six feet in width. The apartment occupied by the plaintiff was on the south side of the passage-way and toward the west end of the building. A lavatory assigned for the use of the plaintiff was entered from such passage-way and there had been constructed a number of cupboards or lockers that also opened on the passage-way. The passage-way was for the common use of all tenants and occupants of the building. The plaintiff and the other tenants had no duty with respect to the maintenance, care, and lighting thereof. It was the duty of the defendants to maintain and to light it. The entrance to the apartment occupied by the plaintiff was upon such passage-way. Under the rental agreement between the plaintiff and the defendants, plaintiff was given the exclusive use of a locker or cupboard in the passage-way. The locker or cupboard opened on the passage-way and was located about 20 feet east of the entrance to the apartment occupied by the plaintiff. Immediately west of plaintiff's apartment was a "wash room",—a room available to the tenants for laundry purposes. Some distance east of plaintiff's apartment was a "large drying room",—a room utilized by the tenants in which to dry clothes that had been laundered. "To get to the drying room from the wash room you went down the passage-way east from the wash room." The locker or cupboard used by the plaintiff was divided into two parts or compartments. There were two separate doors, attached by hinges at each side, which met and fastened in the center. The plaintiff used one of these

compartments for storing various articles and she utilized the other compartment in which to store food, especially canned fruits.

The floor in the passage-way was of concrete, in its natural color. There was no covering of any sort on the floor. Two of the defendants and their families occupied apartments in the building. Shortly before the plaintiff was injured the defendants had begun to construct an additional apartment in the basement, —utilizing a part of the drying room for that purpose. They were doing much of the construction work themselves. They had on hand and had stored in the drying room a considerable quantity of material to be used for the construction. They had ordered a number of sheets of sheet rock or plaster board which were delivered some days before the accident occurred. These boards are constructed with a plaster composition in the center coated on each side with layers of heavy paper. The boards were 4 feet by 8 feet and were packed two boards to a package. The ends of the packages were wrapped in brown colored paper. Each board weighed a little over 50 lbs. so each of the packages weighed a little over 100 lbs. There were in all some five or six packages of these boards. When these boards were delivered the men who delivered them placed them in the passage-way on the opposite side from the apartment occupied by the plaintiff and some distance from the entrance to the apartment. In order to uncover the sewer pipe under the floor of the basement to make sewer connections for the new apartment the defendants found it necessary to move the boards from where they had been placed. One of the defendants testified that the boards were moved on the day the accident occurred. The boards were moved by two of the defendants personally and placed directly in front of and leaning against the cupboard in which the plaintiff kept the canned fruit. In moving them each of the two defendants took a hold of one end of the package containing two boards and carried it across to the opposite side of the passage-way, and there they placed the boards leaning against the cupboard in which plaintiff kept her canned fruit. The defendants admitted that the boards could have been placed elsewhere in the

basement.  One of the defendants stated as a reason for not placing them in the drying room that the defendants had a lot of lumber in there and the boards were not placed there so that if people came down to wash "they wouldn't hurt the boards." The boards were placed so that the edge that was 8 feet long rested on the floor.  The evidence is not definite or clear as to the particular angle at which they were placed.  Plaintiff testified that they stood almost perpendicular.  Two of the defendants had little or no idea as to the angle at which they were placed and the third defendant testified that they were placed so that at the bottom the boards were a distance of about 5 inches from the wall.

The passage-way was ordinarily lighted with an electric light equipped with a 40-watt bulb suspended from the ceiling by a drop cord.  There were three other electric lights farther down the passage-way which were operated by a switch.  The lights nearest the cupboard were used in connection with the drying room.  The cupboard was locked with a padlock.  Plaintiff testified that between 5:30 and 6 o'clock in the evening of March 11, 1947, she decided to go to the cupboard and get a jar of canned fruit for dessert.  She carried the key for the padlock on the cupboard in her hand.  She stated that the hall was dimly lit and that she "hardly believed" that any of the lights in the hall were on.  She testified that when she came to the cupboard and saw the boards leaning against it, judging from their appearance she thought they were light fiber boards or plywood and that she could move them away from the cupboard sufficiently far so that she could open the door and put her hand in and take out the jar of canned fruit which she intended to get.  She placed the key in the lock so that it would be out of the way and then grasped the boards firmly with both hands.  She stated that they moved easily and she proceeded to try to move them back. She stated that the boards became unwieldy and slipped and while retaining her hold on them she endeavored to get around the end, but the weight became too great and the boards fell over and crushed her to the floor breaking bones in both legs and otherwise seriously injuring her.  As a result of her injuries

she was confined to the hospital for almost four months. There is no dispute as to the serious nature of her injuries nor is there any claim that the damages allowed are excessive. The only questions presented with respect to the evidence or the facts concerns the questions of negligence and contributory negligence.

It is well settled that where the owner of premises leases parts thereof to different tenants and either expressly or impliedly reserves certain parts thereof, such as entrances, halls, or stairways for the common use of different tenants, "it is his duty to exercise reasonable care to keep safe such parts of which he so reserves control, and if he is negligent in this regard, and a personal injury results by reason thereof to a tenant or to a person there in the right of the tenant, he is liable, provided the injury occurs while such part of the premises is being used in the manner intended." 32 Am Jur, Landlord and Tenant § 688, pp 561–563, § 302, p 577; 52 CJS 38, et seq.; 2 Restatement, Torts, § 360, p 976, et seq.

The passage-way in which the accident occurred was under the control of the defendants and it was their duty to maintain it. The passage-way was for the common use of the tenants and occupants of the building. Under the rental agreement, however, the plaintiff had occasion to use the passage-way for purposes which were not common to the other tenants. She alone was entitled to the use of the cupboard and there was also assigned to her for her individual use a lavatory which was entered from the passage-way. The cupboard and lavatory were actually part of the premises for which the plaintiff paid rent. She had a right to use the cupboard and to have access thereto without hindrance. The defendants for their own convenience, for their own benefit, and in disregard of the rights of the plaintiff placed the plaster boards against the cupboard so as to interfere with and in fact bar entrance to the cupboard unless and until the boards were removed to such extent as to permit the doors of the cupboard to be opened. The action of the defendants in placing the boards against the doors of the cupboard was not occasioned by any emergency. They admitted that they had

other places in the basement, available and accessible, where the boards could have been placed.

The plaintiff was a woman 66 years of age. Apparently she was living alone in the apartment which she occupied. She had occupied this apartment for a considerable period of time as a tenant of the former owners. She continued to occupy it after the defendants became the owners. She was known to the defendants. Two of the defendants occupied apartments in the building and the third defendant took an active part in matters relating to the maintenance of the apartment and was actively engaged in constructing the new apartment and familiar with the premises. He was one of the parties who moved the boards and placed them in front of the cupboard door. At the time of the accident the plaintiff used the passage-way and the cupboard for the purposes for which they were intended and for which she had an unquestioned right to use them. When she came to the cupboard for the purpose of getting a jar of canned fruit and found the boards in front of the cupboard there was no warning or anything to indicate that the boards were of such character, or that they had been so placed, that there was any danger likely to result from an attempt to move them. She did not know the nature or character of the boards other than what might be ascertained from their appearance, and judging by such appearance she assumed that they were light fiber boards. It is argued that she should have lifted the boards and that the failure to do so constituted negligence contributing to her injury. We do not agree. She could hardly assume that the defendants had intended to bar her from entrance to the cupboard or that they had left boards there of a type which would be dangerous for her to attempt to move or which she would be unable to move sufficiently to enable her to open the cupboard doors without obtaining the assistance of others. The defendants, however, did know the character and construction of the boards and they knew the manner in which the boards were placed and the condition of the floor on which they rested and according to the testimony of one of the defendants the character and the construction of and the material in the boards made it necessary that two persons handle each package be-

cause if the boards were dropped or not handled carefully they were likely to crack or break, and this apparently is the reason or at least one of the reasons why the defendants did not put the boards in the drying room. There is no evidence as to what wall boards constructed wholly of fiber, of the type which plaintiff judging by the appearance assumed the boards to be, would weigh, but it is not denied that such boards would be much lighter than the plaster boards or sheet rock which the defendants placed in front of the cupboard.

Ordinarily negligence, proximate cause, and contributory negligence are questions of fact for the jury. They become questions of law only when the evidence is such that ordinarily intelligent, reasonable, and fair-minded men in the exercise of reason and judgment can reasonably draw only one conclusion; but if the evidence is such that ordinarily intelligent, reasonable, and fair-minded men in the exercise of reason and judgment may reasonably draw different conclusions from the evidence and circumstances as to the facts or the deductions to be drawn from the facts, then they are questions of fact for the jury. McGregor v. Great Northern R. Co. 31 ND 471, 154 NW 261, Ann Cas 1917E 141; Dougherty v. Davis, 48 ND 883, 187 NW 616; Newton v. Gretter, 60 ND 635, 236 NW 254; Logan v. Schjeldahl, 66 ND 152, 262 NW 463; Leonard v. North Dakota Co-op. Wool Marketing Asso. 72 ND 310, 6 NW2d 576; Maloney v. Grand Forks, 73 ND 445, 15 NW2d 769.

We are agreed that under the evidence in this case it cannot be said that ordinarily intelligent, reasonable, and fairminded men could reach only the conclusions that the action of the defendants in placing the boards where they did at the time and in the circumstances which they did place them did not constitute negligence, or that such men after considering and weighing the evidence could only reach the conclusion that such negligence did not constitute the proximate cause of the injuries sustained by the plaintiff. We are also agreed that it can not be said that such men in considering and weighing the evidence could reach only the conclusions that the plaintiff had assumed the risk, or that her action viewed in the light of the circumstances constituted contributory negligence. On the contrary

we are of the mind that as to these questions reasonable men in the exercise of reason and judgment might, and probably would, reach different conclusions and that consequently such questions were properly for the jury to determine.

Defendants have cited the decision of this court in Torgerson v. Minneapolis, St. Paul & Sault Ste. Marie R. Co. infra, in support of their contention that there is no evidence showing actual negligence on the part of the defendants and that the evidence establishes as a matter of law that the plaintiff assumed the risk and that her injuries were caused by her own negligence. The facts in the Torgerson case were quite different from the facts and circumstances in this case. The Torgerson Case came before this court on an appeal from an order sustaining a demurrer to the complaint. Naturally, the question of contributory negligence was not involved. The Torgerson case involved a situation where the plaintiff was an employee who had been employed by the defendant railway company for more than three years. He was directed by the foreman of the crew to unload a box car containing grain doors. The doors were in three piles,—one in the center of the car and one at each side of the center pile. He first removed the center pile and thereafter doors from the other piles fell upon and injured him. The grounds of negligence alleged by the plaintiff in that case was the failure of the defendant to provide a reasonably safe place in which to work and the failure of the defendant to warn the plaintiff of the danger to which he would be subjected while performing his work. After the case had been remanded to the district court the complaint was amended and the case was again brought before this court on appeal from an order overruling a general demurrer to the amended complaint and this court held that the amended complaint did state a cause of action. Torgerson v. Minneapolis, St. Paul & Sault Ste. Marie R. Co. 51 ND 745, 200 NW 1013.

Defendants assign error upon the refusal of the court to give the following instruction to the jury:

"You are instructed that under the evidence in this lawsuit Mrs. McCullagh had the same opportunity to observe the condi-

tions with respect to the piling of the plaster boards as did the Fortunes. She was bound to use all of her faculties to avoid danger to her. If she did not do so, she was guilty of contributory negligence, and cannot recover."

There was no error in refusing to give this instruction. The plaintiff did not have the same opportunity to observe and to know the conditions with respect to the piling of the plaster boards as did the defendants. The defendants knew the character of the boards. They placed the boards and knew how they were placed. The matter referred to in the latter part of the requested instruction that the plaintiff was required to use all her faculties to avoid danger were fully covered by other instructions stating rules at least as favorable to the defendants as they were entitled to have stated. The trial court instructed the jury as follows:

"If you find from the evidence that Mrs. McCullagh voluntarily placed herself in a position which she knew or with reasonable care should have known was dangerous, she cannot recover. A person is conclusively presumed to be aware of a danger which she would have known if she had made ordinary use of her own senses.

"If you find from the evidence that Mrs. McCullagh had the means of knowing that the boards were dangerous if they were pulled out from the wall, then you are instructed that under the law she had no right to run the chance of injury to herself by trying to get the jar of fruit, and your verdict in that event must be for the defendants. . . .

"The court instructs the jury that one who voluntarily places herself in a position of danger, knowing the situation as it exists, and knowing at the time how she might avoid the danger to herself if she used ordinary care for her own protection, is assumed in law to have assumed the risk of the situation which she voluntarily goes into. Then she cannot recover."

The defendants also predicate error upon the refusal of the court to give the following instruction:

"Mrs. McCullagh complains that the way the plaster boards were left by the defendants constituted a trap and a nuisance.

You are instructed that 'trap' and 'nuisance' are legal terms, and that under the evidence as it developed in this lawsuit, there was no trap and there was no nuisance."

This requested instruction is predicated upon a statement in the complaint that the sheet rock where it was placed and the manner in which it had been placed against plaintiff's storage locker constituted a trap and a nuisance negligently caused by the defendants.

The trial court did not err in refusing to give the instruction. The record does not show that the complaint or any part thereof was read to the jury by counsel in the opening statement, or that any reference was made to the particular statement in the complaint during the introduction of evidence or the arguments to the jury. The words "trap" and "nuisance" are not necessarily legal terms. Both words have a popular meaning. Indeed it is at least doubtful whether the word "trap" can be said to have a technical meaning as a legal term distinct from its popular meaning. When a word which has both a technical and a popular meaning is used in a statute, the court, in construing the statute, "will accord to it its popular signification, unless the very nature of the subject indicates, or the context suggests, that it is used in its technical sense." 2 Lewis' Sutherland, Stat. Const. 2d ed p. 752.

We think that in this case the words "trap" and "nuisance" were employed by the pleader and intended to be understood in their popular sense. To have instructed the jury that these words had a distinct technical meaning as distinguished from their popular meaning would have been rather misleading unless the court further had informed the jury of their technical meaning. The requested instruction did not purport to give any such meaning. In any event it is inconceivable that these particular words could have had any controlling effect upon the jury in determining the questions of negligence, contributory negligence, and assumption of risk, all of which were submitted to the jury under instructions which were eminently fair to the defendants. It follows from what has been said that the judgment appealed from must be affirmed. It is so ordered.

NUESSLE, Ch. J., and MORRIS and BURKE, JJ., and GRONNA, District J., concur.

BURR, J., did not participate.

(On Petition for Rehearing)

CHRISTIANSON, J. The defendants have petitioned for a rehearing. The first contention advanced in the petition is that "the Court failed to rule on the question of whether or not the plaintiff was bound by the same standards of care as were the defendants." The question of standard of care is involved in every negligence case but it is not always a controverted question presented to the court for determination. Indeed the reported cases show that in a great majority of negligence cases the question of standard of care was not discussed or determined. We must admit that it did not occur to us that in this case any question was presented requiring a determination by this court of what constituted the standard for measuring the conduct of the parties.

At the very outset of the argument in appellants' brief it is stated: "This is a negligence case. It is, of course, a fundamental rule that the conduct of the plaintiffs and defendants is measured by the same standard—the standard of the reasonable man. This universal rule was recognized by the trial court in its instructions." Following this statement are certain quotations from Judge Cardozo's "Paradoxes of Legal Science" and from Judge Holmes' "The Common Law" to the same effect as the statement in appellants' brief. At the beginning of the argument in respondent's brief it is said: "We have no particular quarrel with the quotations set forth at page 13 of appellants' brief but such statements must be considered in the light of the rule that negligence is always a relative or comparative term as is also the rule pertaining to ordinary care." The court, among others, gave the following instructions to the jury:

"Ordinary care, as used in these instructions, means that degree of care which a person of ordinary prudence would exercise under the same or similar circumstances, in the same or similar transactions or affairs of life."

"By negligence is meant the failure to exercise ordinary care, as the term 'ordinary care' has been defined above.

"The standard of conduct required by the law of the plaintiff and the defendants is exactly the same. There cannot be one rule for the defendants and a different rule for the plaintiff."

No exception was taken to any of these instructions by either the plaintiff or the defendants. These instructions, of course, constitute the law of the case.

"Negligence is a relative term and depends upon the degree of care necessary in a given case." I Shearman & Redfield on Negligence, Revised Edition, p. 6. See Halverson v. Zimmerman, 60 ND 113, 232 NW 754; Gallagher v. Great Northern R. Co. 55 ND 211, 212 NW 839; Rice v. Portland, 141 Or 205, 17 P2d 562; Ehret v. Scarsdale, 269 NY 198, 199 NE 56, 102 ALR 211.

"Negligence is the failure to exercise the degree of care demanded by the circumstances." Gallagher v. Great Northern R. Co. supra.

"It is not what one does, considered of itself and apart from all other considerations, which is to be judged in determining whether there has been an exercise of ordinary care. It is to what he does as related to the circumstances under which he acts that the test is to be applied." I Shearman & Redfield on Negligence, Rev ed p 8.

"The standard by which the conduct of a person in a particular situation is judged in determining whether he was negligent is the care which an ordinarily prudent person would exercise under like circumstances. As has been said, negligence is the omission to do something which a reasonable man, guided by those considerations which ordinarily regulate the conduct of human affairs, would do, or the doing of something which a prudent and reasonable man would not do. Concisely stated, the test of due care is the supposititious course of an ordinarily prudent and careful person under the same circumstances." 38 Am Jur 676, Negligence § 30.

"Ordinary care is such as an ordinarily prudent person would exercise under similar circumstances. That *standard* of care is unvarying, but the *degree* of care varies with the circumstances." I Shearman & Redfield on Negligence, Rev ed, p 6.

The relation and the situation of the parties, the nature, characteristics and condition of the instrumentality or property in connection with the use or control of which negligence is charged, the locality in which a particular act is done or omitted are matters for consideration in determining whether ordinary care has been exercised. 45 CJ pp 694–696.

"The amount or degree of diligence and caution which is necessary to constitute due, reasonable, or ordinary care changes with changing conditions, and varies according to the exigencies which require vigilance and attention, so that the same conduct may, under one set of circumstances or in particular surroundings, constitute sufficient care, and under other circumstances or in other surroundings, be negligent or even amount to gross negligence or wantonness. Indeed, so great is the effect of circumstances that the same conduct, under different circumstances or in different situations, may range from the highest degree of care to gross negligence." 45 CJ pp 693–694.

In Grand Trunk R. Co. v. Ives, 144 US 408, 417, 36 L ed 485, 489, 12 S Ct 679, the Supreme Court of the United States said:

"There is no fixed standard in the law by which a court is enabled to arbitrarily say in every case what conduct shall be considered reasonable and prudent, and what shall constitute ordinary care, under any and all circumstances. The terms 'ordinary care,' 'reasonable prudence,' and such like terms, as applied to the conduct and affairs of men, have a relative significance, and cannot be arbitrarily defined. What may be deemed ordinary care in one case, may, under different surroundings and circumstances, be gross negligence. The policy of the law has relegated the determination of such questions to the jury, under proper instructions from the court. It is their province to note the special circumstances and surroundings of each particular case, and then say whether the conduct of the parties in that case was such as would be expected of reasonable, prudent men, under a similar state of affairs. When a given state of facts is such that reasonable men may fairly differ upon the question as to whether there was negligence or not, the determination of the matter is for the jury. It is only where the facts are such that all reasonable men must draw the same conclusion

from them, that the question of negligence is ever considered as one of law for the court."

In Gallagher v. Great Northern R. Co. 55 ND 211, 212 NW 839, supra, this Court said:

"The term 'negligence' is relative and its application depends on the situation of the parties and the degree of care and vigilance which the circumstances reasonably impose. . . .

"Ordinarily negligence and contributory negligence are questions for the jury. They become questions of law only where the material facts are established by undisputed evidence and the inference from the facts is so certain that all reasonable men in the exercise of a fair and impartial judgment can arrive at only one conclusion. 20 R. C. L. pp. 169–171. In other words, in an action to recover damages for personal injuries the questions whether the defendant has been guilty of negligence and whether the defendant has been guilty of contributory negligence are for the determination of the jury, 'Not only where there is room for difference of opinion between reasonable men as to the existence of the facts—from which it is proposed to infer negligence, but also where there is room for such a difference as to the inferences which might be fairly drawn from conceded facts.' Shearm. & Redf. Neg. 6th ed. Sec. 54; .'"

The standard by which the conduct of the defendants is to be judged in determining whether they were guilty of negligence is the conduct of ordinarily prudent persons under like or similar circumstances, conditions or surroundings, and the standard by which the conduct of the plaintiff is to be judged in determining whether she was guilty of contributory negligence is the conduct of an ordinarily prudent person under like or similar circumstances, conditions or surroundings. 38 Am Jur §§ 29–30, pp 673–677, § 190, pp 866–867; Walsh v. Chicago R. Co. 303 Ill 339, 135 NE 709.

We have again reviewed the evidence in this case and adhere to the views expressed and the conclusions reached in the former opinion. We are agreed that the facts and circumstances in this case are not such that intelligent, reasonable and fairminded persons could reach only the conclusion that the action of the defendants in placing the boards where they were placed

constituted ordinary care, and that such persons could reach only the conclusion that the acts of the defendants in so placing the boards did not constitute the proximate cause of the injuries sustained by the plaintiff. On the contrary we believe that intelligent, reasonable and fair-minded persons in the exercise of reason and judgment might well reach the conclusion that the defendants in placing the boards as and where they were placed failed to exercise ordinary care and were guilty of actionable negligence and that such negligent acts constituted the proximate cause of the injuries sustained by the plaintiff. We are also agreed that intelligent, reasonable and fair-minded persons in the exercise of reason and judgment after considering and weighing the evidence might well reach the conclusion that the plaintiff had not assumed the risk of the injuries which she sustained and that an ordinarily prudent person under like or similar circumstances, conditions and surroundings might well have acted as the plaintiff did. In short, we are of the mind that under the facts and circumstances of this case negligence, contributory negligence and assumption of risk were questions for the jury.

The next contention advanced in the petition for rehearing is directed at the part of the former opinion relating to the decision of this court in Torgerson v. Minneapolis, St. Paul & Sault Ste. Marie R. Co. 49 ND 1096, 194 NW 741. As was said in the former opinion appellants cited the decision of this court in the Torgerson case in support of their contention that there was no evidence showing actual negligence on the part of the defendants and that the evidence establishes that the plaintiff assumed the risk and that her injuries were caused by her own negligence. Indeed it was asserted that from what was said in the decision in the Torgerson case "It would seem that this court is already committed to the proposition that under the facts in the instant case there can be no recovery." In the former opinion in this case we said that "the facts in the Torgerson case were quite different from the facts and circumstances in this case." It is asked "How were they different?" And it is said, "that the only difference counsel can see is that in the Torgerson case you had involved an employer-employee relation and

in this lawsuit you do not." We have carefully considered the contention advanced by appellants and are still of the mind that the facts in the Torgerson case "were quite different from the facts and circumstances in this case,"—different to such extent that the decision in the Torgerson case does not have any controlling effect in this case.

"It is a maxim not to be disregarded, that general expressions, in every opinion, are to be taken in connection with the case in which those expressions are used." Cohen v. Virginia (US) 6 Wheat 264, 399, 5 L ed 257, 290.

"It is a general rule," said Chief Justice Marshall (Ogden v. Saunders (US) 12 Wheat 333, 6 L ed 647), . . . "that the positive authority of a decision is co-extensive only with the facts on which it is made."

As is pointed out in the former opinion, the Torgerson case came before this court on an appeal from an order sustaining a demurrer to the complaint and naturally the question of contributory negligence was not involved. The Torgerson Case involved a situation where the plaintiff was an employee who had been employed by the defendant railway company for more than three years. He was directed by the foreman of the crew to unload a box car containing grain doors. The doors were in three piles,—one in the center of the car and one at each side of the center pile. He first removed the center pile and thereafter doors from the other piles fell upon and injured him.

The plaintiff in his complaint predicated his right of action upon :—

"First, the negligent failure on the part of the defendant to furnish a reasonably safe place in which to work, and secondly, a negligent failure on the defendant's part to instruct plaintiff had to proceed to unload the doors and to warn plaintiff of the danger that the remaining pile or piles of doors might shift and topple over upon plaintiff, when the central pile was removed." (49 ND 1102–1103, 194 NW 743).

The court considered the propositions in the order stated. In disposing of the first proposition the court said:

"Plaintiff alleges 'that an inspection of the place where he was ordered to work would not reveal the imminent danger he

had been exposed to.' Taking this allegation as true, 'the imminent danger' to plaintiff must have resulted from the prosecution of the work he was engaged to do—the manner of the removal of the grain doors from the car. The premises, including the car and the piles of doors, were not, in themselves, dangerous, or unsafe; the danger or risk came into existence only, if at all, after the work of unloading commenced and by reason of the actual prosecution of the work, of changing conditions and of the manner in which the work was done. We think that the rule that the master must furnish the servant a reasonably safe place to work has no application in this case." (49 ND 1103, 194 NW 743).

The rule thus applied by this court is recognized quite generally, and is said to be an exception to the rule requiring the employer to make safe the place where his employees are at work. 35 Am Jur 615, Master and Servant § 187; 18 RCL p 595; Anno 28 LRA NS 1267.

The court next considered the second ground on which plaintiff's cause of action was predicated. In disposing of this proposition the court said in part:

"Did the defendant owe a duty to the plaintiff to instruct him how to proceed to unload the doors and to warn him of the risk and danger that the pile of doors on either side of the central pile might topple over when the latter was removed? It seems to be fundamental that the duty to warn exists only when the master possesses knowledge of risks or dangers, or should, in the exercise of ordinary care for the servant's safety, have such knowledge, not within the knowledge of the servant, or discernible by the latter in the exercise of ordinary care. . . . The master was not, under the facts alleged, required to assume or anticipate that the servant would ignore natural laws, adopt a method of work manifestly dangerous, or one which a person of his age and experience, in the exercise of ordinary care, must have known to be dangerous under the circumstances. There can be no liability for failure to anticipate danger to a servant and to warn him thereof, unless the master's knowledge of the danger, or opportunity to have knowledge thereof, having in mind the master's primary duty to make in-

quiry, is superior to that of the servant. (Citation of authority). The master here had no reason to anticipate that the servant would remove the central pile and leave one pile on each side standing with consequent danger to himself from the falling of one or both of them. (Citation of authority). It would seem reasonable to suggest that, if it cannot be held negligent on the part of the plaintiff to unload the doors in such a way as to leave a pile or piles standing in such a position as to be manifestly dangerous to himself, it cannot be deemed negligence on the part of the defendant to fail to anticipate that he would do this very thing and to omit to warn plaintiff against unloading the doors in this particular way. Such risk as there was lay entirely in the method of work adopted by plaintiff. (Citation of authority). Whatever danger inhered in the method adopted was clearly discernible to a man of ordinary intelligence and experience. . . . We are constrained to hold that, in the exercise of common observation, any man of ordinary intelligence would understand the situation entirely and appreciate the risk to his person involved in removing the central pile of doors from the car while leaving a pile on each side standing. No warning could have made the danger plainer; the probability that the doors might fall could not be better known or understood by the employer than by the employee; it was obvious to any person having knowledge of elementary natural laws, presumed a common possession of the mass of mankind. It seems clear, therefore, that the master was not negligent in failing to warn the servant. (Citation of authority).

"There is no allegation that the doors were negligently piled in the car; or that they were piled in an unusual manner, or that plaintiff never unloaded grain doors before and did not know the proper manner of unloading them. There is no allegation in the complaint from which it can be inferred that the defendant knew or should have known that plaintiff would first remove the central pile, leaving the others a standing menace to himself, or that it was at fault in permitting the risk to exist that one pile of doors might fall when another was removed, or that such risk resulted from any negligent act or omission

on its part. There is no allegation that defendant knew that plaintiff had no experience in unloading grain doors. In other words, the risk that the doors might slide or topple down, under the circumstances, was an ordinary risk, understood by plaintiff, incidental to the employment and the method of unloading adopted by plaintiff and was, therefore, assumed by him. (Citation of authority). The risk having been ordinary and such as to be observable and appreciated by a person in the use of ordinary observation and of ordinary intelligence, the presumption being that plaintiff was in the possession of ordinary and unimpaired faculties of observation, there was no duty to warn or instruct the servant."

We think the facts in this case readily distinguish it from the Torgerson case. The relation and position of the parties and the situation and circumstances of the accidents were quite different. In the Torgerson Case the plaintiff had been an employee of the defendant for some three years. In the course of his employment he was directed to unload a box car containing grain doors. He entered upon the work. He handled the doors. He removed and unloaded the entire center pile. The plaintiff in this case was not an employee of the defendants, she was a tenant who had rented certain premises from them. She had not handled the boards and knew nothing about them except that she had seen them in the hallway. In the course of the preparation of her evening meal she went to the cupboard to obtain some canned fruit which she kept there. She found that the boards had been placed against the cupboard so that it was impossible to open the cupboard door unless the boards themselves or the tops were moved sufficiently to enable her to open the door. There was no warning or anything to indicate that the boards were of such character or that they had been so placed that there was any danger that any injury might result from an attempt to move them. She assumed from the appearance of the boards that they were made of light weight material and it occurred to her that she might be able to move the tops of the boards away from the cupboard door sufficiently to enable her to open the door of the cupboard and obtain the food which she sought. She grasped the boards firmly and found that they

moved easily and proceeded to try to move the tops of the boards to enable her to obtain entrance to the cupboard. She was required to exercise ordinary care for her own protection against injury but she was not bound to anticipate negligent acts or omissions on the part of the defendants. 45 CJ § 512, pp 954–956; 38 Am Jur 871, Negligence § 192. We repeat what we said in the former opinion: "She could hardly assume that the defendants intended to bar her from entrance to the cupboard or that they had left boards there of a type which would be dangerous for her to attempt to move or which she would be unable to move sufficiently to enable her to open the cupboard doors without obtaining the assistance of others."

As stated in the former opinion the Torgerson case was again brought before this court on appeal from an order overruling a general demurrer to the amended complaint. In the amended complaint the cause of action was bottomed solely upon the alleged negligence of the defendant in failing to warn the plaintiff of the danger of the work. The complaint alleged certain matters not stated in the former complaint, among others, that the plaintiff at the time when he was employed by the defendant and at all times when he had worked for the defendant "suffered from defective eyesight and defective hearing, which defects greatly impaired his mental abilities and activities and on account of such defects was unable to recognize any dangerous condition"; that defendant knew of plaintiff's defective condition and at times had to warn him of danger, and "knew that plaintiff was not in a mental and physical condition such that it was safe to let him continue in its employment as a section hand"; that the section foreman was outside the car taking the doors from the plaintiff as the plaintiff handed them out to him; that the section foreman had a more favorable position to observe the condition of the grain doors and was better able both physically and mentally to judge the danger to the plaintiff than was the plaintiff, and that he owed a duty to warn plaintiff of the danger. This court held that the amended complaint did state a cause of action. Torgerson v. Minneapolis, St. Paul & Sault Ste. Marie R. Co. 51 ND 745, 200 NW 1013.

It is next contended that "the Court erred in holding that the boards the plaintiff thought were against her locker would have weighed less than 50 pounds." It is stated that it is assumed that "what the Court is doing here is to take judicial notice of the weight of these imaginary boards, their general use, and their effect on the plaintiff." This statement is leveled at that part of the following sentence in the former opinion which we have italicized: "There is no evidence as to what wall boards constructed wholly of fiber, of the type which plaintiff judging by their appearance assumed the boards to be, would weigh, but *it is not denied that such boards would be much lighter than the plaster boards or sheet rock which the defendants placed in front of the cupboard.*" On her direct examination the plaintiff testified that when she came to the cupboard for the purpose of obtaining food she had stored there, she found the boards in front of and leaning against the locker. She next testified:

"Q. What did you think they were?

A. I thought they were some kind of light weight material. I thought perhaps it was pressed paper or plyboard."

On her cross examination she testified:

"Q. I think that you testified on direct examination that your impression was as you looked the boards over that they were made of paper?

A. Very light weight boards. I didn't think very much about what they were made out of, something like plyboard.

Q. You thought they were plyboard, and that they were light in weight?

A. Something along that nature. I didn't know what they were."

She further testified that the boards were wrapped in paper and that she did not try to lift any of the packages. There was no objection to any of this testimony by any of the parties, either to that produced on direct examination or on the cross examination. The cross examination then proceeded as follows:

"Q. If you had lifted one package of two boards and then de-

termined that the boards were too heavy for you, would you still have pulled them out from the side of the wall?

Plaintiff's Attorney: We object to that as calling for a speculative and conclusive answer, and improper cross-examination, constituting a so-called "iffy" question, improper cross examination.

The Court: The form of the question is that, but he is testing her ability to recognize the material handled. I think the objection will be overruled.

A. I didn't—I never thought of them being too heavy.

Defendant's Attorney: Q. I am asking what you would have done if you had tried to lift them and found that they were too heavy for you to handle. Would you under those circumstances, having that knowledge, still have tried to pull the boards out from the side of the wall?

Plaintiff's Attorney: Same objection, incompetent, irrelevant and immaterial added to the objection.

The Court: Objection overruled. She may answer.

Plaintiff's Attorney: Answer if you can.

A. If I had taken one board, you say and found it too heavy?

Defendant's Attorney: Q. Yes.

A. Well, no, of course not.

Q. You would not have tried to pull them out at all then?

A. No."

The defendant, William Fortune, Sr., having been examined prior to the trial, in response to questions propounded by plaintiff's counsel, testified as follows:—

"Q. And do you know how much they (the plaster boards) weighed per package?

A. Well, they were not very heavy. I imagine John must have got the weight from some place. I have seen a lot of people handle them is the only reason—

Q. Just give us the weight, if you know.

A. I would say about 25 pounds a piece, 50 pounds to the package."

Upon the trial the plaintiff called the manager of the lumber company from whom the defendants had purchased the plaster

boards which fell upon and injured the plaintiff. He testified that a package of two plaster boards weighed 100.8 pounds; that the boards were made up of plaster filling with paper on both sides; that they were wrapped two boards in a package, the wrapping paper being red or brownish; that the inside of the boards consisted of plaster and that the boards were known as sheet rock or plaster board. On cross examination of the manager of the lumber company defendant's counsel asked the following question to which the manager gave the following answer:

"Q. These plaster boards are *getting to be* quite an ordinary method of construction now days?

A. Yes, they are."

It will be noted that on cross examination of the plaintiff defendant's counsel referred to the testimony she had given on direct examination that she thought the boards were some kind of light weight material,—perhaps pressed paper or plyboard. He then said "I think you testified on direct examination that your impression was as you looked the boards over that they were made of paper?", to which plaintiff replied, "Very light weight boards. I didn't think very much about what they were made out of, something like plyboard." Defendant's counsel then asked:—Q. "You thought they were plyboard, and that they were light in weight?" Plaintiff answered:—A. "Something along that nature. I didn't know what they were."

Thereupon the cross examination proceeded and the plaintiff was asked what she would have done if she had tried to lift the boards and found that they were too heavy for her to handle. Apparently the purpose of this examination was to show that if the plaintiff had attempted to lift the plaster boards and thus ascertained how heavy they were she would not have attempted to move them. On the argument in this court much stress was laid on the fact that the plaintiff had not lifted or attempted to lift any of the boards before she attempted to move them and it was contended that she was guilty of contributory negligence in attempting to move them without having first attempted to lift them and thus ascertained their weight. The evidence as to the composition of the plaster boards indicates that the boards

would be of considerable weight and heavier than wall boards made of light material such as the plaintiff stated she assumed the boards to be. We did not "take judicial notice of the weight of these imaginary boards, their use and their effect upon the plaintiff." Indeed we did not know that the boards to which plaintiff referred were a figment of her imagination. There was no claim upon the trial to that effect or that wall boards of the type which plaintiff stated she thought these to be did not exist. There was no objection to the testimony or motion to strike it and there was no request for instruction that there was no proof that there were any wall boards of light weight such as the plaintiff testified she assumed the boards which she found in front of her locker to be. We did take notice of the testimony that was given and the reasonable inferences to be drawn from such testimony and we think it is true, as was said in the former opinion, "There is no evidence as to what wall boards constructed wholly of fiber, of the type which plaintiff judging by the appearance assumed the boards to be, would weigh, but it is not denied that such boards would be much lighter than the plaster boards or sheet rock which the defendants placed in front of the cupboard." Of course, an affirmance of the judgment is not dependent upon this statement. If it were stricken from the opinion, the result reached in the former opinion would remain the same.

A rehearing is denied.

NUESSLE, Ch. J., and MORRIS and BURKE, JJ., and GRONNA, District J., concur.

BURR, J., did not participate.