**DICKINSON EDUCATION ASSOCIATION, Petitioner and Appellant,**

v.

**DICKINSON PUBLIC SCHOOL DISTRICT, Respondent and Appellee.**

**Civ. No. 920236.**

Supreme Court of North Dakota.

April 27, 1993.

Chapman and Chapman, Bismarck, for petitioner and appellant; argued by Michael Geiermann.

Pearce & Durick, Bismarck, for respondent and appellee; argued by Gary R. Thune.

MESCHKE, Justice.

Dickinson Education Association (DEA) appeals a district court judgment denying its petition for a writ of mandamus requiring (1) that DEA and Dickinson Public School District (the District) execute a negotiated agreement based upon the 1990–1991 negotiated agreement, with a salary change negotiated during the 1991–1992 school year, and (2) that the District issue contracts under the negotiated agreement for the 1991–1992 school term. We reverse and remand.

DEA and the District began contract negotiations for the 1991–1992 school year by starting a collaborative bargaining process [1] on May 1, 1991. DEA initially raised

---

1. Dr. Rollie Morud, superintendent of the District, explained collaborative bargaining in an affidavit:

ten items for negotiation, including base salary. The District initially raised the "sixth period teaching day" as a subject of negotiations by proposing the elimination of Paragraph B4 of the existing negotiated agreement. Paragraph B4, which negotiated agreements had contained for many years,[2] provided, in part, that the normal class load for junior and senior high teachers is five classes, and that a teacher will be paid extra if assigned a sixth class. In August 1991, the District raised the issue of limiting its contribution to the health insurance premiums of DEA members by placing a "cap" on the amount it would pay.

■ In February 1992, the parties agreed that an impasse existed and requested the involvement of the education factfinding commission. *See* NDCC 15–38.1–03. Three unresolved items were submitted to the factfinding commission at its hearing on April 9, 1992: (1) Paragraph B4, which the DEA wanted retained, and which the District wanted eliminated so that teachers could be assigned to teach six classes without extra pay; (2) salary schedule—the District offered to increase the base salary from $15,226 to $15,546, while the DEA requested an increase to $15,800; and (3) health insurance, with the District proposing to cap its health insurance premium payments at the 1991 level, and DEA proposing that the current policy of full payment be retained, with the District absorbing any future increases. The fact-finding commission recommended:[3] (1) that Paragraph B4 be retained; (2) that the base salary be set at $15,546; and (3) that the current health insurance policy of full premium payment by the District be retained.

After receiving the recommendations of the factfinding commission, the parties met again to negotiate on May 11, 1992, but were unable to reach an agreement. On June 2, 1992, the District made its final offer, which DEA rejected. On June 8, 1992, the District: (1) rejected "the DEA final offer of accepting the Fact Finding Commission Report as settlement for the 1991–1992 school year"; (2) declared "that good faith negotiations have been completed for the 1991–1992 school year"; and (3) instructed the administration

> to unilaterally issue contracts to teachers for the 1991–1992 school year based on the Board's final offer, including the recommendations of the Extra Curricular Committee report. The specifics of the Board's final offer are:
>
> 1. Base salary of $15,546 with retroactivity to include all of the school year 1991–1992.
> 2. Health insurance contributions by the district will be capped at current rates and any rate increases on or after January 1, 1993, will be the responsibility of the employee....
>
> * \* \* \* \* \*
>
> 3. Seven–Period Day

2. *COLLABORATIVE BARGAINING:* In the Spring of 1991, for the first time, the Dickinson Education Association (DEA) and the Dickinson School Board (Board) agreed to follow a new path in negotiations by implementing collaborative bargaining. The primary objective of this approach was to eliminate the past practice of confrontation by, among other things, removing structure which created barriers to settlement. Following this break with past practice, no ground rules were established with reference to procedural matters such as keeping minutes, the length of meetings, the number of people and their seating at the table, and the manner in which items were to be proposed for negotiations. More specifically, for the first time in many years, there was no ground rule which required that all proposals be presented at the first negotiations meeting. In the spirit of that agreement, the Board elected not to submit any list of initial proposals, while the DEA did submit such a list....

2. Although the provision had been in negotiated agreements for many years, we are not confronted with a case in which the District has attempted to unilaterally eliminate an evergreen contract or clause. *See* Black's Law Dictionary at 555 (6th ed. 1990) (An evergreen contract is one "which renews itself from year to year in lieu of notice by one of the parties to the contrary.").

3. The factfinding commission "[did] not have any binding authority but merely [had] the authority to make public its findings after a certain period of time." *Edgeley Educ. Ass'n v. Edgeley Pub. Sch. Dist. #3*, 231 N.W.2d 826, 833 (N.D.1975) (*Edgeley I*).

On July 1, 1993, Paragraph B4 on Page 18 of the Professional Negotiated Agreement will be deleted and a School Improvement Team, as outlined below, will be activated to study the implementation of a seven-period day.

██ On June 17, 1992, the DEA petitioned for a writ of mandamus, and the district court issued an order temporarily restraining the District from offering contracts to DEA members unless based upon the 1990–1991 agreement, as modified by a 1991–1992 salary change, and with no changes in pay for teaching a sixth period, or in health insurance. After a hearing on July 6, 1992, the district court found, among other things:

> While the health insurance provisions and the deletion of Paragraph B–4 do not effect [sic] the 1991–92 school year, both of these final offer provisions establish starting points for negotiating the 1992–93 negotiated agreement, with the health insurance provision controlling the Board's contribution during the 1992–93 school year in the event negotiations have not been completed by January 1, 1993. Therefore, both of these provisions were properly included as integral parts of the Board's final offer.

The district court concluded that the District "complied with all of the procedural requirements of Chapter 15–38.1 of the North Dakota Century Code" and that DEA "failed to establish a clear legal right to the relief sought." The court dissolved the temporary restraining order and denied the petition for a writ of mandamus. Judgment was entered accordingly on August 4, 1992, and DEA appealed on August 7, 1992.[4]

In *Wenman v. Center Bd.*, 471 N.W.2d 461, 463 (N.D.1991), we reiterated the requirements for a writ of mandamus and our scope of review upon appeal from the denial of a writ:

The prerequisites for the issuance of a writ of mandamus are well established. The petitioner must show that she has no plain, speedy, and adequate remedy in the ordinary course of the law and that she has a clear legal right to the performance of the particular act sought to be compelled by the writ. *Feldhusen v. Beach Public School Dist. 3*, 423 N.W.2d 155, 157 (N.D.1988); *Fargo Educ. Ass'n v. Paulsen*, 239 N.W.2d 842, 844 (N.D. 1976). This court will not overturn a trial court's denial of a writ of mandamus unless the trial court has abused its discretion. *Bradley v. Beach Public School Dist. No. 3*, 427 N.W.2d 352 (N.D. 1988).

NDCC Ch. 15–38.1 governs the process of contract negotiations between teachers and public school districts. NDCC 15–38.1–01 provides that teachers may join organizations and "be represented by such organization in their professional and employment relationships with the public school districts." NDCC 15–38.1–12 provides for good faith negotiations:

1. The school board, or its representatives, and the representative organization, selected by the appropriate negotiating unit, or its representatives, shall have the duty to meet at reasonable times at the request of either party and to negotiate in good faith with respect to:

a. Terms and conditions of employment and employer-employee relations.

b. The formulation of an agreement, which may contain provision for binding arbitration.

c. Any question arising out of interpretation of an existent agreement.

\* \* \* \* \* \*

4. The obligations imposed in this section shall not compel either party to agree to a proposal or to make a concession.

---

**4.** Counsel for the District informed us that the parties have not yet begun to negotiate a contract for the 1992–1993 school year, choosing to wait for our decision in this case so that they would know the starting point on the issues of health insurance premiums and the seven-peri-

od day. While negotiations conducted during the pendency of litigation may render an appeal moot, *see, e.g., Rolette Educ. Ass'n v. Rolette Pub. Sch. Dist. No. 29*, 427 N.W.2d 812 (N.D. 1988), pending litigation is not a legal impediment to negotiation.

■ Under the National Labor Relations Act, 29 USCA § 151 et seq., "[a]n employer may not unilaterally change a mandatory subject of bargaining even though it was unilaterally instituted by the employer, was not discussed in bargaining negotiations, and was not expressly covered by the contract." 48 Am.Jur.2d, *Labor and Labor Relations* § 1016 (1979). Public schools and their teachers are not covered by the National Labor Relations Act and are, therefore, not subject to the jurisdiction of the National Labor Relations Board. *See* 29 USCA § 152(2), which excludes "any State or political subdivision thereof" from the term "employer" in the act. *See also Fargo Educ. Ass'n v. Fargo Pub. Sch. Dist. No. 1*, 291 N.W.2d 267, 270 (N.D.1980) ("Chapter 15–38.1, in its present form, is not a collective bargaining statute within the terms of the Labor Management Relations Act and determinations of the National Labor Relations Board."). Nevertheless, the same rule applies to contracts between public schools and teachers. In *Williston Educ. Ass'n v. Williston Pub. Sch. Dist. No. 1*, 483 N.W.2d 567, 571–72 (N.D.1992), we held: "An agreement cannot be altered unilaterally by one party to the contract.... Only terms and conditions 'not covered by this agreement' are subject to the District's exclusive control without negotiations." While the parties may negotiate what the subjects of negotiation will be, under NDCC 15–38.1–12, the courts can mandate negotiation on salaries, hours, formulation of an agreement, binding arbitration, and interpretation of any existing agreement. *Fargo Educ. Ass'n v. Fargo Pub. Sch. Dist. No. 1.*

■ NDCC 15–38.1–12 does not compel either party to make a concession during negotiations, *Edgeley Educ. Ass'n v. Edgeley Pub. Sch. Dist. # 3*, 256 N.W.2d 348 (N.D.1977) (*Edgeley II*), and does not compel the parties to reach an agreement, *Fargo Educ. Ass'n v. Paulsen*, 239 N.W.2d 842 (N.D.1976). The statute merely requires the parties to negotiate in good faith. *Belfield Educ. Ass'n v. Belfield Pub. Sch. Dist. No. 13*, 496 N.W.2d 12 (N.D.1993). "[T]o 'negotiate' simply means to present proposals and offer counterproposals, to discuss proposals, to carry on a dialogue, to exchange ideas, all for the purpose of persuading or being persuaded by logic and reasoning." *Fargo Educ. Ass'n v. Paulsen*, 239 N.W.2d at 847.

NDCC Ch. 15–38.1 does not contain a mechanism for dealing with a situation in which the parties, despite good faith negotiations, are unable to reach an agreement. We said in *Dickinson Educ. Ass'n v. Dickinson Pub. Sch. Dist. No. 1*, 252 N.W.2d 205, 209–10 (N.D.1977), that "Chapter 15–38.1, N.D.C.C., recognizes that there comes a point—*after the conclusion of a good faith negotiation process*—when a school board must be allowed to make contractual offers to the teachers of a school system, which contracts the teachers must choose either to accept or to reject." In *Edgeley II*, this court stated when the good faith negotiation process ends and what may be done to resolve remaining differences:

> The conclusion of a good faith negotiation process requires more than the mere passage of time and more than just going through the motions of a negotiation process—it implies that one or both sides have reached their final position, a position which is supported by pertinent factual considerations.... At such point, the good faith negotiation process established in Chapter 15–38.1, N.D.C.C., ceases. The Legislature has failed to provide a mechanism by which the parties might resolve their remaining differences—thus, the School Board is permitted to issue contracts to the School District's teachers on the basis of its last offer.

256 N.W.2d at 354. Both sides rely on this decision.

Relying on *Edgeley II*, DEA contends:

> The position taken by the DEA is that the District is limited in making its last offer to terms and conditions of the contract which have applicability for the school year which is the subject of the negotiations. The DEA will assert that the school district does not have any authority to unilaterally issue contracts on last offers which include contractual provisions which do not apply to the

school year at hand but only apply to future school years.

Also relying on *Edgeley II*, among other cases, the District contends: "In a number of cases, the North Dakota Supreme Court has recognized the rights of school districts to unilaterally issue contracts to its teachers based upon the *Board's* last offer." The District contrasts its position with what it deems to be DEA's contention:

> The DEA offers no legal authority to support its position that the last offer upon which contracts are unilaterally issued can not include any items which have a prospective application. Rather, the DEA seeks a ruling that would change the law in North Dakota to provide that when contracts are unilaterally issued at the conclusion of good faith contract negotiations, the contracts should issue based upon the last offer of the employee, not the employer. Such a position is clearly contrary to the law in North Dakota, as well as that of other jurisdictions.

The District contends that "DEA's position ignores the prospective nature which is inherent in all contract negotiations." [5]

In *Edgeley II*, the School Board and the Edgeley Education Association (EEA) began negotiating a contract for the 1976–1977 school year on February 5, 1976. After several meetings, the EEA had reduced its original proposal for a base salary increase of $2,184.00 down to $1,650.00, while the School Board had increased its original proposal for a base salary increase of $100.00 up to $250.00. The School Board declared an impasse and submitted the matter to the education factfinding commission, which recommended a base salary increase of $300.00, if the School Board participated in a health and hospital insurance program and paid the cost of a single membership for each teacher, or a base salary increase of $550.00 without such an insurance program. The EEA voted to accept the recommendations, and the School Board rejected them. On or about June 15, 1976, the School Board issued individual teaching contracts. This court held that the good faith negotiation process had ceased without an agreement, and, because the Legislature had not provided a mechanism for resolving the parties' remaining differences, the School Board was "permitted to issue contracts to the School District's teachers on the basis of its last offer." 256 N.W.2d at 354.

 "Our opinions should be read in the light of the facts of the case under discussion." *First Fed. Sav. & Loan Ass'n v. Scherle*, 356 N.W.2d 894, 897 (N.D.1984). Generally, " 'the positive authority of a decision is co-extensive only with the facts on which it is made.' " *McCullagh v. Fortune*, 76 N.D. 669, 685, 38 N.W.2d 771, 780–81 (1949) (quoting from Chief Justice Marshall's opinion in *Ogden v. Saunders*, 12 Wheaton 213, 333, 6 L.Ed. 606, 647 (1827)). The language in an opinion "must of course be read in the light of the problem that the court was then considering." *Northwestern Improvement Co. v. Norris*, 74 N.W.2d 497, 507 (N.D.1955). The last-offer contracts involved in *Edgeley II* were for the school year being negotiated and were performable during that year. Thus, the "positive authority" of this court's opinion in that case goes no further than to uphold a school board's issuance of last-offer contracts for the school year being negotiated that are performable during that year. Thus, we agree with DEA's assertion that, under *Edgeley II*, "if the District is going to ... unilaterally issue

---

5. Certainly, all contracts look to the future. However, it is easy to recognize a difference between a contract requiring future performance of an act within the year for which the contract is being negotiated, and a contract requiring future performance of an act not to be performed within the year for which the contract is being negotiated, i.e., performance of an act to be performed in some future year beyond the year for which the contract is being negotiated.

Here, the District's last offer, upon which it proposed to unilaterally issue contracts, which the teachers could accept or reject, required the performance of future acts—changing the District's health insurance contribution policy so that rate increases on or after January 1, 1993, would be the responsibility of teachers, rather than the District, and eliminating Paragraph B4 on July 1, 1993—at future times beyond the 1991–1992 school year for which a contract was being negotiated.

contracts on its 'last offer' that last offer is limited to contractual provisions for the school year which is the subject of negotiations and no others." We conclude that DEA showed that, under *Edgeley II,* it had a clear legal right to performance of the act sought to be compelled by the requested writ of mandamus, and that the trial court abused its discretion in denying the writ.

 We recognize that NDCC Ch. 15–38.1 does not place school boards and public school teachers on equal footing in contract negotiations. In all contract negotiations conducted under NDCC Ch. 15–38.1, a school board always holds a trump card—the power to unilaterally issue last-offer contracts, which teachers must either accept or reject—ranking higher than any held by the teachers. Because of that tremendous disparity in bargaining power, we decline to extend *Edgeley II* to allow a school board to unilaterally issue last-offer contracts containing provisions that, while not applicable to the school year that is the subject of negotiation, are applicable to a future year not yet under negotiation.

The judgment is reversed, and the matter is remanded for entry of judgment consistent with this opinion.

VANDE WALLE, C.J., LEVINE, J., and RALPH J. ERICKSTAD, Surrogate Judge, concur.

Surrogate Judge RALPH J. ERICKSTAD was Chief Justice at the time this case was heard and served as surrogate judge for this case pursuant to Section 27–17–03, N.D.C.C.

Justice J. PHILIP JOHNSON, who was a member of the Court when this case was heard, did not participate in this decision.

Justice NEUMANN and Justice SANDSTROM, not being members of the Court when this case was heard, did not participate in this decision.